Next case is Wittendorf v. Worthington for the Appellant Mr. Park and the Appellant Ms. Myers, you may proceed. Mr. Park and Ms. Myers, you may proceed. Mr. Park and Ms. Myers, you may proceed. Mr. Park and Ms. Myers, you may proceed. Mr. Worthington, the Respondent, verbally and physically intimidated and abused Ms. Wittendorf. And like many victims of domestic violence, Ms. Wittendorf stayed with him, convinced herself that she loved him, and believed that she could do no better. And like many victims of, excuse me, in this cycle of abuse, apology and make-up could have continued for years more. But, and it did last for more than two years. But then, Ms. Wittendorf had a baby, a beautiful boy named LW. And it finally took the birth of that child for her to realize that she was in an abusive relationship. And she realized for the first time that it wasn't just her safety and well-being anymore, it was also the safety and well-being of her child. And that was her wake-up call. And unlike so many victims of domestic violence, she had the courage to leave at that point. So she was able to step out of herself and look at her situation and really see it for what it was. She was in an abusive relationship. And she needed to get out. So when her child was four months old, she took that child and made a decision that no parent really should be forced to make to raise that child by herself without the help of the baby's father. And she raised that child by herself until the child was 16 months old, until the circuit court, in this case, ordered overnight, unsupervised weekend visitations with that child for Mr. Worthington, somebody who's never really spent any extended period of time with that child. The issue before this court is whether that visitation was proper and reasonable. This visitation order allowed a volatile domestic violence abuser with unsupervised overnight visitations of a child that he barely knew. This was improper because it was not reasonable under the circumstances. The legal standard here is not disputed. Section 607 of the Illinois Dissolution Act sets forth how this court or how the district court decides visitations in these cases. Quote, a parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger seriously the child's physical, mental, moral, or emotional health. And this court decided recently in Ray J. W., in an opinion by Justice Neck, which was joined by Justice Appleton, that this was the standard for married and unmarried parents. And we do not dispute that in this case. And we understand that this case is now on appeal to the Illinois Supreme Court, and should the standard change in some way, we'll pursue our legal options at that point. But for purposes of this appeal, we're not disputing that standard. So the way that the statute is written, it precludes visitation entirely if the court finds that there is a likelihood that the visitation would endanger seriously the child's physical, mental, moral, or emotional health. But even if that endangerment standard is not met, the court further has to analyze what's reasonable visitation under the circumstances. And that's what the court below did not do in this case. And just to be clear about the standard, this is an interrelated determination. What's reasonable depends on what type of visitation is sought and whether that would endanger the child. For example, if the statute specifically contemplates, for example, electronic visitation, it's hard for me to imagine under that type of visitation how that could endanger seriously the child's physical health. But if the type of visitation that's sought is weekend visitation, overnight, unsupervised, well under that circumstance, there may be some endangerment to the physical health of the child. So it's not a two-step analysis that's removed from each other. Does the court's order here allow the father to take the child out of the state of Illinois? There was no limitations on that, Your Honor. So there presumably could be a situation. There is some time limit, so it would be difficult for the father to, for example, take the child out of state and come back within 48 hours, which was the visitation. But there was no limitation on where the father could take the child or who needed to be there under what, in fact, there's actually not much limitation at all. And that's one of our concerns. So the legal standard here is not in dispute. Also what's not in dispute is how one reaches, how one figures out what the reasonable visitation is under that standard. And that's a factual determination. What are the facts and what are the circumstances of the case here? Was he asking for visitation in Georgia? I believe that he was. There was some discussion in the record about the responsibility for transportation, that she should drop off the child in Georgia and that he would bring the child back to Illinois. And I believe the court in this case actually ordered that she's not responsible for transportation. So practically I think what, I'm not aware of what's happened since the order, but practically what would have happened is that he would have driven to Illinois and visited with the child and then leave because he had a flexible work schedule. The evidence in this case was clear. It's not every case where the weight of the evidence is this clear. The circuit court in this case heard testimonies from four witnesses on behalf of Ms. Wittendorf. And three of them were actually attorneys, were officers of this court. And one individual was a child protection specialist for DCFS. And Mr. Worthington did not call any witnesses on his behalf other than himself. And here's really what the trial court heard. The trial court heard from Ms. Sarah Kavanaugh, who was one of Ms. Wittendorf's closest friends. She was an attorney and a prosecutor, and they worked together in the state attorney's office for several years. At the time of the testimony, she had been a prosecutor for seven and a half years and had substantial experience in domestic violence court. And she testified that as Ms. Wittendorf's friend, she became increasingly concerned about Mr. Worthington's conduct and the way that he treated her. For example, she observed strange bruises on Ms. Wittendorf. Even though she made excuses for herself that it was a motorcycle accident, she didn't believe them because it wasn't consistent with what was on her body. And she personally also witnessed very demeaning and offensive language that was directed at Ms. Wittendorf. And I'm not talking about words of anger or the usual fights that married or couples who are together have. These are words that are so derogatory and demeaning that as an officer of this court, I'm not going to repeat them here, but they're in the record. And she directly witnessed these instances when she was staying with them for a few days and observed these things happening. Not only that, there were instances where she witnessed property destruction. Now, taken in their isolated instances, they may not seem like much. For example, Mr. Worthington got upset with Ms. Wittendorf and punched a hole through a driveway. He got so angry once that an alarm clock didn't wake him up that he pulled the cord out of the wall and started swinging it around the room and destroyed the alarm clock and the shelves that are around it. Now, granted, these are overreactions and taken by themselves. One may say, okay, that's a strange thing. But you'll see that a pattern of behavior emerges where he reacts unreasonably to everyday stressors. Do you not want the father to have any visitation at all? No, that's not our position. In fact, we hope in the future that the father will have unsupervised visitation. In fact, it's not something that we want. We would want there to be a loving family relationship between the father and the son. But in this case, the father's not ready for that. From his past behavior— So you want it to be supervised? Yes, Your Honor. We'd like it to be supervised at first. And if it goes well and if the visitations are consistent, I believe that he can move on to unsupervised visitation. But for the court to have started immediately on unsupervised overnight visitations, we believe that that was just not reasonable and abuse of discretion under the circumstances. I know that Your Honors are familiar with the record, but I'd like to point out just a few more facts that were brought up in trial court. Ms. Schnabel, who was Ms. Wittendorf's former roommate and friend, also testified. And she was a child protection specialist at DCFS. And she testified not only to witnessing some of the property destruction— for example, the garbage can being thrown against the house and destroying the window. He got angry once and actually punched the windshield of a car with his bare hands. I'm not sure what happened to his fist, but that's a pretty extreme thing to do. But aside from that, she also testified about her belief on what the visitation should be in this case. And she was asked, Do you have an opinion, based on your knowledge between Ken, Mr. Worthington, and Jeanette, Ms. Wittendorf, and of violence? Do you have an opinion as to whether Mr. Worthington should have unsupervised visitation? Answer, at this point, I would not recommend unsupervised contact. Question, would you be concerned then if you were to have unsupervised visitation? Answer, yes. Question, and what would those concerns be? Answer, there was a history of domestic violence between them. I also have been aware of prior history of domestic violence with another ex-girlfriend. The way that he berates Ms. Wittendorf would give me concerns of the small, vulnerable, unable-to-protect-themselves child being in the care without supervision. And, Your Honor, that really is our position in this case. And that probably goes to the heart of the case. As I mentioned, we hope that Mr. Worthington will be able to step up and be consistent in his child's life. But he has demonstrated that that is not what he does. There's a period where he acts well, and then there's a period where he overreacts, gets angry and violent, and then he feels sorry for it. In fact, one of the first instances of violence, he cried to Ms. Wittendorf and said that he would never do that again. Unfortunately, from that time on, it just escalated from property disruption to actually hitting her multiple times. And as an attorney, I understand the difficult position that this court is in. When do you determine when domestic violence occurred? That's beyond just everyday stressors and everyday hardships that couples have. And I would submit to you, Your Honor, that in cases of verbal abuse, that may be a little bit difficult to tell, because where do you draw the line? But in cases of physical violence, hitting your spouse repeatedly, that's not acceptable. And I believe that this court can draw the line there. And in this case, the weight of the evidence does demonstrate that there definitely was domestic violence. Now, Ms. Shadia Jurgis also testified. I'd just like to point out two important things about her testimony. Number one, she testified that she personally witnessed Ms. Wittendorf with her child, and that she was a loving, caring, attentive mother who was very appropriate. Her home was appropriate. And I don't believe that that's in dispute in this case. Number two, she's also an attorney, and as somebody who's actually knowledgeable about patterns of domestic violence, she testified that the pattern here is that it's a cycle. There's a period of calm, and then violence, and then apology, and then another period of calm. And really, if you look at Ms. Wittendorf's testimony, that's exactly what happened. Now, Ms. Wittendorf's testimony is important in this case because, of course, she is the petitioner. And I believe that Your Honors have gone through the record. So I'd like to just point out a few significant facts from her testimony. Ms. Wittendorf and Mr. Worthington. The trial court was somewhat critical of your client, was he not? Yes. And did the father make several trips to Illinois to see the child, and she refused to allow him to do that? Yes, Your Honor. So what happened was after Ms. Wittendorf left late January or February 1st of 2011, there was a period where there was no contact. In fact, when she left, he sent her a text saying, you know, he's better off if he never sees me. I don't ever want to have anything to do with you. And that's why I'm leaving you. Now, after she was gone for a while, he actually showed up unannounced at her workplace in Milcine. So she went and got an order of protection. This was completely out of nowhere. So she went and got an order of protection saying he's not to bother me at work and he's not to come to my house. He's not to come within 200 or 250 feet of the child. So she was really following the orders of that. She was really following that protection order. And even beyond that, Your Honor, the trial court was very critical of the fact that she did not allow him access to the child. I can't second guess the trial court, but the trial court appeared to be punishing her in some way for doing that, that they had no contact for approximately a year. And in fact, trying to make up for that time by giving him liberal visitation in this case. The trial court didn't say that she denied visitation while there was an order of protection in existence, did he? No, I don't think the trial court mentioned that. In fact, there was one in existence. There was one in existence. So basically, the trial court is saying forget about the order of protection. When he showed up, you should have allowed visitation. I believe that's right, Your Honor. I believe that's essentially what happened. This is, I believe, victim-blaming, that she should have let him see the child. Well, this would have never happened if he had actually not abused her and made her leave. So it's really sort of the way that you look at things in perspective. But at this point, you're willing for him to have supervised visitation? Yes, Your Honor. We are realistic. I don't know exactly what's happened since the order in April, but the father has been having contact with the child if the orders were implemented. And at this point, first of all, it would be unrealistic to undo that contact. And moreover, under the endangered seriously standard, I believe that's a really difficult burden for us to meet. But if you look at that in the context of the visitation that he's asking, it does meet that standard for the overnight weekend visitations. I believe I have two minutes, so I'm going to just wrap up really quickly about Mr. Worthington's testimony. One thing I'd like to point out about Mr. Worthington's testimony is that he flatly denied that any of this actually happened. He got up on the stand when asked, are all of these people, are they lying? Essentially, that's what was asked of him. And he said, yeah, yes, they're lying. None of this ever happened. He did admit to the fact that he verbally said very bad things about her. He did admit that. He only admitted that because she had actual texts of him calling her a fucking whore and all of these things that he had said about her. So only when pressed against the corner did he admit that he actually verbally said derogatory things about her. But he flatly denied that three attorneys and one DCFS worker would get up on the stand and make things up, literally make things up. The trial court did not make a credibility determination in this case, but that's just not credible in the overall weight of the evidence. And he did not go through the instances and explain any of the facts. He just said that none of that happened, never hit her, never did any of these things. I have a question, Jerome. It's probably not an issue, but I don't understand what it means. He granted her residential custody. Does that have some special meaning? I don't believe so. That was brought up, actually, in the motion for reconsideration. And I believe the trial court clarified simply that it's a physical custody, that the child is going to be living with her. And that's it? That's really it. Was the trial judge trying to imply this is some special double secret form of custody? Do you glean any of that from the record or from the trial court? It's a limited custody. I'm giving you custody now, but things may change. I don't understand the phraseology. But if you don't either, that's fine. Your Honor, honestly, I do not understand that. I see that my time is up, so I'd like to wrap up. You'll have additional time under rebuttal. Ms. Myers? Good afternoon, Justices, Counsel, may it please the Court. My name is Barbara Myers, and I represent the appellee in this matter, Mr. Kenneth Worthington, the father in this case. And I had a little spiel all written out for the beginning of my argument, as most of us do. But before I go into my spiel, I have to respond to a couple of the points that Mr. Park made and maybe answer a couple of the questions that the Justice has asked of him. And with all due respect to Counsel for Ms. Wittendorf, I think that to characterize the events that led up to that order of protection as him randomly showing up at her workplace after nothing had been happening, I think that mischaracterizes what actually happened here. And, again, I know you're familiar with the case. I know you're familiar with the record. I don't want to be overly pedantic about this. But by the time that order of protection was entered, there had already been a family division case in front of Judge Otwell going since early February. What happened was Mr. Worthington had come to Illinois at least once or twice in those intervening months because I think it was sometime in April that he came before the Court and said, yes, I'm the child's father, I want visitation. That had happened in April. The events surrounding that order of protection were, they were supposed to have a hearing in front of Judge Otwell that day. He apparently had showed up to her workplace at some point. He was in Illinois for a hearing. This wasn't just out of the blue. They were supposed to appear in front of Judge Otwell that day. And if you look at the record, if you look at the docket entries, for whatever reason that hearing didn't take place. But there was supposed to be a hearing that day. This isn't a case of someone just randomly dropping in and saying, oh, I'd like to suddenly torpedo your life. They were supposed to have a hearing that day. And that's the bottom line. So it's a bit of a mischaracterization to say that he just ignored the situation entirely. As soon as she filed her initial petition to establish parentage, Mr. Worthington was in the case. He might have done a not so great job of it because he was an out-of-state pro se litigant, but he was still in the case. What was the hearing supposed to be about that day, if you remember? You know, Your Honor, I'm not sure off the top of my head. But I believe what had been happening was they initially determined that Mr. Worthington was the father, and then they were going to work on the issues of child support, custody, and visitation. And I don't think it was ever a serious issue that Ms. Wittendorf was not going to get custody in this case because it just wasn't. But the impression I got from reading the record and looking at those docket entries is they kept coming back for the status hearings and kept coming back for status because there were some issues with discovery, as I'm sure you're all aware, often happen when you have pro se litigants involved. The other question I wanted to address was Justice Connacht's question about residential custody. And I can't speak for Judge Otwell, but just at least in my family law practice, I don't think he should have put it in the order. But informally, we usually throw around that term to distinguish it if there's a joint custody situation. And so you'll talk about both parents have legal custody of the child, but one of them will have physical custody or residential custody. I don't know how it made it in this order because it's clearly not a joint custody situation. But I think that was just a misstep by the judge. And it was cleared up in the motion for reconsideration. But just to keep things brief, as you're all aware, in these visitation cases, the standard on review is abuse of discretion. And so the question we need to be asking ourselves is if any reasonable person, if there's no reasonable way anyone could agree with what Judge Otwell did in this situation. And I just don't think that's the case here. Because...  I'm sorry. He can hear it back. He's got a little coffee. Sorry. And there's a really good reason that in visitation cases, abuse of discretion is the standard on review. And that's because trial judges in most situations, but particularly in family cases, they need that discretion because they are taking in just a massive amount of information. They're looking at people fighting with each other in their courtroom and yelling at each other. They're taking in sometimes incoherently presented, frequently pro se, incoherent presentations, highly emotionally charged material, witnesses who completely contradict each other so that it sounds like neither one of them is telling the truth. That's what these family law judges are dealing with. And that's why the standard on appeal is so high, why it's abuse of discretion. And I don't think you can say that Judge Otwell ruled arbitrarily or that he didn't employ conscientious judgment in this case. He looked at the evidence that was before him and he ruled accordingly. Who issued the order of protection? That was Judge Narduli. Okay. And... What took... I mean, understanding that he might have had to hire for the parties to work out some favorable schedule for when your client was traveling back and forth for these various hearings, how do you work that out with the order of protection? I think the answer there, Your Honor, I mean, again, I can't speak for Judge Otwell, but I think the issue with the order of protection was that the judge, obviously Judge Otwell didn't enter it. It was entered by default. There was a very brief default hearing on it. And I think ordinarily in those situations you'll have the visitation exchanges in a public place where there's an OP where it's one of the, usually the noncustodial parent against, I'm sorry, the custodial parent against the noncustodial parent. Ordinarily you'll have the visitation exchange in a public place or you'll get a third party to do it. And it's true that that's not part of Judge Otwell's order. Although he did put in the language that you see in a lot of these visitation orders about, you know, each parent needs to be respectful of these visitation exchanges. They're not, you know, they have to comport themselves accordingly. They're not supposed to use these as an opportunity to scream and yell and do whatever it is that might be harmful. In your view, what did Judge Otwell take from the, he said the incident involving the girls' night out gave him a more rounded picture of the relationship between the parties than did the things that Mr. Parks' client testified to, the other things she testified to. What does that mean? The impression I got from, and again, I wasn't Mr. Worthington's trial counsel, so I can't. Well, then you're looking at the cold record the way that we are. And I will tell you what it seems to me is he thought that somehow was more important. This girls' night out when maybe there was some degree of unseemly behavior, I guess, because she was out with a girlfriend and over-imbibed, that that had greater significance than the testimony unrebutted, save for your client denying that any of it ever occurred, these allegations of emotional abuse and domestic violence. Again, I can't speak for Judge Otwell or peer inside his brain, but the impression I got from it was that here's a judge, again, he's faced with these litigants who are flatly contradicting each other, and so the impression I got was that he was looking, and there's no, I mean, unlike in a lot of these cases that involve domestic abuse, there's no medical records, there's no psychologist or psychiatrist testimony, there's nothing you could look at that even approaches being objective from either side. So I think by seizing on that incident, he's looking at something that everybody agreed actually happened to some extent or another because Ms. Otwell didn't deny that it happened, Mr. Worthington didn't deny that something happened that night, and even Sarah Cavanaugh testified about the lead-up to that incident. And I think especially, and this speaks to part of the problem, is that we're talking about all these other alleged incidences of violence, those are all things that happened years before the child was born. And that's another reason I think Judge Otwell probably looked at this as the one instance, the one allegation of something Mr. Worthington did that actually occurred after the child was born. Because everything up until that point was before he even existed. Did he deny that he had the conversation with Jeanette's friend? I'm sorry, which conversation are you referring to? When she called up and said, we've been out, we need a ride. I think his response to that was that he didn't want to come give him a ride because he had the baby, and he didn't want to put the baby in the car seat late at night and drive across town. I think that was his response. So the record would show he specifically denied that he ever said any of the angry or acrimonious things that he said. I don't know that he actually denied that, no. But again, I think that Judge Otwell focused on that incident because, again, it was one of the few that happened after the child was born. And, again, that's part of the problem with a lot of the evidence in this case. You have people who are, and I don't mean to disparage anyone, but these are her friends. Yes, they're lawyers and they're DCFS workers, but they're her friends. And a lot of what they testified to was hearsay, it was double hearsay, it was conjecture. I mean, she has her friend Tanya Schnabel saying, well, you know, she had bruises and scrapes, but she said those were from a motorcycle accident. But I knew better. I knew that Ken must have caused that. I mean, when you're a trial judge and you're looking at that, what are you supposed to think? I mean, was she lying when she told it to her friend? Is she lying now? What does Judge Otwell do with that information? And he's getting hearsay, sometimes double hearsay, from officers of the court. These are lawyers testifying who you would think would know better than to say things like, well, I just don't think that he should be around the child and supervised because of what I know, what she told me he did. I don't think it's any surprise that Judge Otwell found that evidence to be somewhat lacking and not worthy of this much weight. Because, again, no one here is entitled to have a judge believe them. You're not entitled to credibility just because you're an officer of the court, just like Mr. Worthington isn't forced to be disbelieved by the court because he was convicted of conspiracy to commit residential burglary when he was 17. That's not how it works. You still have to convince the judge that you are credible, that your story checks out, and Judge Otwell, because he's the one sitting in that courtroom observing the demeanor of the witnesses, assessing their credibility, he is the one who makes those determinations. And, again, that's why the standard on appeal is abuse of discretion. Because he has that wide discretion to look at the whole picture. And, by the way, it's not just all of this testimony that we're talking about. Judge Otwell is aware of the entire universe of facts surrounding this case. He's aware of Ms. Wittendorf's unilateral decision to take the child from his home state of Georgia and come to Illinois. He was aware of that. He was aware, as we discussed before, that there had been a couple of times when Mr. Worthington had come to Illinois for these hearings, asked for visitation, and she said no. He was aware of that. He was aware that when he gave her at that February hearing earlier this year, she said under oath that if there has to be visitation, she wants it to be supervised visitation with the child's daycare provider. That's exactly what he initially ordered at that February hearing. And her response to that was to say, no, no, you're not thinking about the baby. I changed my mind. I don't want to do that. This is, again, the universe of facts that Judge Otwell is taking in when he's making his determination. There was one more thing I wanted to touch on before I complete my presentation, and that's in Ms. Wittendorf's briefs. There are just examples of the high-flown rhetoric that has surrounded this case from day one. They're calling Mr. Worthington, he's a felon, he's an absent dad, he's an out-of-state father. I just wanted to point out, first of all, he's an absent dad because she left the state they were living in. She left the state the child was born in. And he has been trying since then to see his son and have a relationship with his son. But that high-flown rhetoric, it's just an example of the double binds that her behavior has put Mr. Worthington in. Because if he tries, if she leaves the state, if he tries to find his son and have a relationship with his son, he's an abuser, he's a stalker. That's what they're going to say. But if he doesn't, they're going to say, oh, well, he didn't try to see his kid. He's not really interested in his life. And the same goes for the fact that their son is a baby at this point. If he tries for visitation now, they're saying, oh, you know, he's just a baby. We need to ease into it. And the child doesn't know him. Well, the child doesn't know him because she took off with the child. That's why he doesn't have a greater relationship with his son because she left. But even still, if he doesn't ask for visitation now, if he doesn't do this now, then they can always say, well, you know, he didn't show any interest for the first few years of that child's life. So, you know, it's too late. It's going to endanger the child because the child doesn't know him because he's been out of the life so long. And now they're saying that it endangers the child because even now they're saying that that's the case. So if he waited, it would be the same. So, again, in closing, I just want to reiterate it's abuse of discretion, and this court can affirm on any basis in the record. I think that there are plentiful bases in the record on which you can affirm. He didn't dissolve the order of protection, correct? No, Your Honor. I believe he just modified it. Right. Well, what does that suggest about his – is that somewhat inconsistent with his The impression that I have gotten from the record is that Judge Otwell considered the relationship between them to be a very bad and toxic one, which may be why he left the order of protection in place as it pertained to Mr. Worthington vis-a-vis Ms. Wittendorf, but he only modified it to allow any contact to facilitate the visitation. But he permits the contact to be personal rather than just by telephone or letter. The word personal is used, which would permit face-to-face contact with someone that previously has been ordered not to be within however many feet, and somehow believing that an order of protection is going to limit what they say or talk to each other about. And the three of us were trial judges for a long time, and we know about orders of protection, and we know just about how much worth that piece of paper has. If you say, no, I'm holding it, you can't talk to me about that. Either of them holding it, you know. I don't track that. And I understand, given that you're not trial counsel, we're working from the same, what does the record tell us? But those things to me seem to be inconsistent. If you recognize it's a toxic relationship, then you ought to avoid personal contact, yet leave a means by which, if you're going to order a visitation, that somehow it can be accomplished. And I think in writing, or a telephone call from a other, you know, I can envision a case like this where the family lived in Sangamon County, and the grandparents were here. You know, we'd have a situation where they'd say, have the grandparent call, and they'll pick up the child, and then you can have a visitation, and everybody's happy with that because there's no personal contact. Obviously, that can't occur here, but that would be, would you find that to be a typical limitation? It usually would be. The other impression I got from reading the record is that Judge Otwell didn't, he made some comments to the effect of that if procedurally he were able to vacate the order of protection, he would. I'm sorry. So, but I don't think that he believed he was procedurally able to do that, which might be why he only modified it as opposed to vacating it. And again, I think that the circumstances surrounding the entry of that order of protection had a great deal to do with his impression of it because, again, she got the emergency order of protection, I believe it was on June 6th. They both appeared in front of Judge Otwell in the middle of June. Again, I wasn't there, but the docket entry doesn't say anything about an emergency order of protection between parties. He wasn't served with summons for the emergency order until June 20th. The plenary hearing, which was not in front of Judge Otwell, was on June 23rd. So, again, this is the universe of facts that Judge Otwell is aware of surrounding this case. It's a default order that he didn't show up for because he had already been in Illinois twice before that month. And it was an order not entered by him in which Judge Narduli specifically wrote, and it's hard to see. I admit, you actually have to physically take the record apart, look at the top of the page and look at it. But it does say, I'm sorry, on one page it says visitation is denied, but if you look at the top of the next page it says visitation is reserved until the F case. That was never meant to be the final word on the visitation issue, not by Judge Narduli, certainly not by Judge Otwell. So with that in mind, we respectfully request that this court affirm the decision of the court below. Thank you. Thank you, counsel. Rebuttal. Your Honor, it's just three quick points for rebuttal. First is that we heard a lot about the standard of review in this case, which is abuse of discretion. I submit to you, Your Honor, that aside from credibility determinations, this court is actually in better position to make a determination about what the facts are in the case because it has the entire universe of the record in front of it and is able to weigh them in a meaningful way. And Your Honor's picked up on something that I wanted to touch on during my opening remarks, which is the Girls' Night Out incident. The court did seem to find extraordinary significance on that incident, and I believe that it unduly influenced the court's decision in the trial court. What happened there, I can't speak to the appropriateness of the situation, but it was an isolated incident. There was no pattern of going out and getting drunk and calling Mr. Worthington and telling him to pick him up. And this event surrounding that incident also tells the court that he reacts violently, and he was now going from property destruction to being derogatory and physically abusing Ms. Wittendorf to now saying those things to her friends. He was now reaching beyond that. Now, I believe this court said it best in Ray J. W., whenever you're looking at what's going to happen in the future, it necessarily is a speculative thing. You don't exactly know what's going to happen in the future, but you do know what's happened in the past. And the record here clearly indicates that Mr. Worthington is somebody who's volatile, who's angry, someone who's willing to abuse those who are closest to him. And until we know that he is safe and appropriate around L.W., unsupervised visitation in this case would be an error, and it was an abuse of discretion for the trial court to order that. That's it, Your Honor. Thank you. Thank you. We will take this matter under advisement and stand in recess until further call.